STATE v. SON CARRAWAY.

(Filed 4 May, 1921.)

1. **Homicide—Murder—Exclamations—Res Gestae—Hearsay Evidence—Criminal Law—Appeal and Error.**

   There was evidence upon the trial of a homicide tending to show that the prisoner entered unwillingly into the fight resulting in death, and acted throughout in self-defense, and that while engaged in a struggle with the deceased the latter cut him upon the face, neck, and throat, causing a profusion of blood to flow: *Held,* it was competent for an eye-witness to testify to the exclamation of another then coming up, and as a part of the *res gestae,* that the deceased was cutting him to pieces, and not objectionable as hearsay evidence of a past transaction; and the exclusion thereof was reversible error.

2. **Homicide—Murder—Criminal Law—Self-defense—Threats—Communications—Evidence—Appeal and Error.**

   Where the evidence is sufficient upon the question of self-defense upon the trial for a homicide, the exclusion of evidence tending to show that a near relative of the deceased had previously warned the prisoner of the deceased's threat to kill him, constitutes reversible error.

3. **Homicide—Murder—Criminal Law—Dangerous Character of Deceased —Evidence—Self-defense—Appeal and Error.**

   Upon the trial of a homicide, it constitutes reversible error for the trial judge to exclude evidence of the dangerous character of the deceased when drinking when there was evidence that he was in this condition at the time, and that the prisoner had shot and killed the deceased in self-defense.

APPEAL by defendant from *Ray, J.,* at the January Term, 1921, of ANSON.

The defendant was tried on a bill of indictment charging murder of Frank Robinson, and he was convicted of manslaughter with a recom-

36—181

mendation by the jury to the mercy of the court. From the judgment upon such conviction he appealed. The solicitor, at the outset, declined to ask for a verdict of murder in the first degree, but did ask for one of murder in the second degree.

The State's evidence tended to show that the defendant had been charged with begetting a bastard child on the person of a sister of the deceased; that the deceased had made many threats against the defendant, which threats were communicated to him; that in consequence of such threats the defendant armed himself with a pistol and came to the town of Wadesboro on 8 May, 1920; that the deceased sought him out and the trouble occurred between them in front of Gilmore's store, in that town; that he entered into the fight willingly, and killed the deceased with the pistol without legal excuse.

The evidence of the defendant tended to prove the following facts: On 8 May, 1920, the defendant, who resides in the country, came to Wadesboro to deliver milk and butter for his mother. He brought with him a raincoat. He placed this raincoat behind the counter in the store of Mr. Gilmore, together with a pistol. After he had delivered his produce he arranged to ride home with a friend, and went into Gilmore's store to secure his coat. The pocket in the raincoat was shallow and torn, and as his pistol could not be carried in his pocket, he placed the pistol in the pocket of his overalls, and turned to leave the store. The deceased accosted the defendant. The defendant paid no attention to him. The deceased then called the defendant: "Son Carraway, God damn you, you heard me!" The defendant had descended the store steps and was on the sidewalk. The deceased then said: "You God damn son of a bitch, didn't you hear me?" The defendant answered: "Speak to me like I am a human; I am not a dog." Mr. Gilmore, the proprietor of the store, heard this conversation, and stepped up to the two, and placed his hand on Robinson's shoulder and warned him that he would get into trouble, and that he had better leave. He testified that the deceased, Robinson, was still cursing the defendant, and had a knife in his hand. Also that the defendant did not curse, and said nothing more than that he was not afraid of Robinson. Gilmore, seeing that Robinson was bent on trouble, turned his back and went into the store. At this time Carraway, the defendant, undertook to leave, and Robinson got in front of him and cut him off. Defendant turned again, and was again obstructed by the deceased. The deceased then cut the defendant with a knife, entering on the left side of the forehead above the eye, the wound extending down the face, around under the ear, and on the throat. The wound was not dangerous, but bled profusely. After inflicting this blow the deceased grabbed the defendant with his left arm around the neck, clutched his neck with his body pressed against

the defendant's right arm and shoulder. This grasp of the defendant by the deceased was described by the witnesses as the "sandy crook." The position of the deceased was such as to enable him to hold the defendant fast by the neck and by the weight of his body prevented the movement of his right arm. Deceased then undertook to again cut the throat of the defendant, and continued in this effort for some time. The two struggled up the street a few steps, the deceased all the time undertaking to cut the defendant's throat. The defendant, being unable to disengage himself from this "sandy crook," succeeded in drawing his pistol from his pocket and pressed the same against the body of the deceased and fired twice, inflicting mortal wounds. When these shots were fired the deceased was undertaking to reach the throat of the defendant with his knife. After these shots were fired the defendant released himself and at this time he described himself as being dizzy from the blow that he had received and was knocked out of his senses; the blood was just pouring over his face, and he apprehended that his injuries were serious ones. His eyes and face were covered with blood, and in this way his vision became blurred and obstructed. The deceased was then in a stooping or half-sitting posture on the steps of Tice's store. The defendant got a few feet from the deceased and he turned around to see what the deceased was doing. The deceased was gritting his teeth, and had his hand in his hip pocket. The defendant testified that he thought the deceased was fixing to spring toward him again. He then shot three more times. The last shots were superficial and not sufficient to produce serious injury.

It was in evidence that Frank Robinson, the deceased, was under the influence of whiskey at the time of the difficulty.

The defendant assigns the following errors which are based on exceptions appearing in the record:

1. Joe Winfield testified that he was passing Gilmore's store, and saw the beginning of the trouble; that he went back to where the defendant and the deceased were and tried to stop them; that he told the deceased to let the defendant alone; that the deceased paid no attention to him, and that when the defendant tried to leave the deceased got in front of him and stopped him; that at this time the deceased came out with his knife; that they were hooked up together, and scuffled for some distance, and that the deceased struck the defendant somewhere about the face with his knife. The witness was asked this question:

Q. Do you remember who else you saw around there? A. Mr. Jockey Martin—him and his lady had passed and were in the beef market and he come back to me and says, "Joe, he is going to cut him to pieces, ain't he?"

By the court: Was the fight going on at that time? A. Yes, sir.

To the foregoing evidence the State objected. Objection sustained, and the evidence excluded from the jury. The defendant excepted.

2. The defendant, being recalled, testified: "I had been knowing Frank Robinson for about ten years. I knew his reputation for violence when he was drunk. He was mean. He would kill you. He had killed one man."

Motion by the State to strike out answer. Motion allowed, and the defendant excepted.

3. The defendant testified: "Threats were communicated to me as being made by Frank Robinson. Will Robinson's daughter communicated the first threat. She met me on the street down here at Mr. Fulton Allen's store and said to me the boys had decided to leave it to her mother to let her do what she wanted to do. The boys were Will, Lee, and Daisy. These were Frank's brothers. Said they decided to leave it to her mother and let her do what she wanted to do. All except Frank, and Frank said, 'He would be G— d— if he was going to leave it to her—he was going to kill the G— d— s— o— b—. She came to where I was, laughing, and said I had better watch Frank Robinson. I guessed she was referring to the charge that I was the father of the child of Frank Robinson's sister."

At this juncture the State moved to strike out the evidence of the foregoing threats. Objection sustained, and the evidence withdrawn from the jury, to which the defendant excepted.

There are other exceptions to the charge.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*McLendon & Covington and Robinson, Cauble & Pruette for defendant.*

ALLEN, J. The rulings on evidence are erroneous and entitle the defendant to a new trial.

The declaration of Martin, "Joe, he is going to cut him to pieces, ain't he?"—made after the deceased had cut the defendant once, and while he had one arm around his neck and the knife on his throat, was competent as a part of the *res gestae*. McKelvey says, p. 278: "The ground of reliability upon which such unknown declarations are received is their spontaneity. They are the *ex tempore* utterances of the mind under circumstances and at times when there has been no sufficient opportunity to plan false or misleading statements; they exhibit the mind's impressions of immediate events, and are not narrative of past happenings; they are uttered while the mind is under the influence of the activity of the surroundings."

The question is discussed, and the distinction drawn between the exclamation of the bystander brought out by the occasion, and declarations that are narrative of a past occurrence in *Harrill v. R. R.,* 132 N. C., 655, and *Bumgardner v. R. R.,* 132 N. C., 440, and the Court says in this last case: "The law proscribes *hearsay* evidence; but there are certain necessary exceptions to that general rule. Amongst those exceptions are certain declarations made at the time of the main transaction—the principal fact under investigation—if they are connected with the transaction and explain it as to its character and purpose. Such declarations are often called *'verbal acts* indicating a present purpose and intention,' and are admissible as original evidence like any other material facts. It is said in Greenleaf on Evidence, sec. 108: 'The principal points of attention are whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character.' The same author, in the same book, sec. 110, further says: 'It is to be observed that where declarations offered in evidence are merely narrative of a past occurrence, they cannot be received as proof of the existence of such occurrence. They must be concomitant with the principal act, and so connected with it as to be regarded as a mere result and consequence of the coexisting motives in order to form a proper criterion for directing the judgment, which is to be formed upon the whole conduct.' In *S. v. McCourry,* 128 N. C., 594, the prisoner was indicted for murder. Melvin Ray, one of the witnesses, said at the time of the homicide, in answer to a question by a person who was present, 'What that was?' referring to a 'lick,' 'Elijah McCourry hit Bob Ray (the deceased) with a rock.' This Court said the evidence was competent because it was spoken at the instant the fatal blow was given. The Court also quoted with approval from Underhill's Criminal Evidence, sec. 1, the following: 'The exclamations of persons who were present at a fracas in which a homicide occurred, showing the means and mode of killing, are admissible for or against the accused because of their unpremeditated character and their connection with the event by which the attention of the speaker was engrossed.'"

The evidence excluded comes clearly within this principle.

It was also error to exclude the reputation of the deceased for violence when drunk, as there was evidence the deceased was drunk at the time, and the threat communicated to the defendant by a close relative of the deceased, ought to have been submitted to the jury.

Both classes of evidence were material and important on the contention of the defendant, supported by evidence, that he killed the deceased under the reasonable apprehension that he was about to suffer death or great bodily harm, and have been uniformly held to be competent, when

there is evidence of self-defense and the defendant knows of the reputation for violence, and threats have been communicated to him, since *Turpin's case,* 77 N. C., 473, which has been approved twenty-one times.

There is an exception to the charge, which appears to be erroneous on the record, but it is reasonably certain there is some mistake in the transcript, and his Honor is made to use the word "inculpate" for "exculpate."

There must be a

New trial.